### THE HYGRADE NO. 12.
### THE SUSAN A. MORAN.
### THE CUMCO.
### No. A-15525.

District Court, E. D. New York.
May 23, 1940.

Foley & Martin, of New York City, (Christopher E. Heckman, of New York City, of counsel), for libelant.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for the Susan A. Moran.

Hagen & Eidenbach, of New York City, for claimant-impleaded and respondent-impleaded.

BYERS, District Judge.

On March 8, 1938, at about 3 a. m., the libelant's tank barge Hygrade No. 12, lightly laden, was in tow of the Susan A. Moran bound for New York Harbor on her way to Boston from Marcus Hook, Pennsylvania. At about 2:30 a. m. the tow passed in Sandy Hook and proceeded through Swash Channel on the starboard side. About 3 a. m. she was in light collision at her port bow and suffered some damage.

A libel was filed by her owner against the tug and her owner, alleging, in addition to the customary faults: Failure to arrange and carry out proper and timely passing signals "with the vessel observed ahead"; failure to navigate so as to avoid collision "with the scows in tow of the tug which was lengthening hawsers"; failure to shape her course so as to pass clear of that tow, and to take steps to avoid collision, and failure to stand by after the collision had occurred.

The tug was claimed by her owner and, in addition to an answer, a petition was filed impleading the steamtug Cumco, her owner, and her operator; the real controversy has to do with that tug and the manner in which she handled her tow in the waters involved in this cause.

The collision occurred during the hours of darkness; there was no sea running; visibility was good; there was an ebb tide of about 1½ miles an hour, and a westerly to southwesterly wind prevailed of about 13 miles. Since all the carrying vessels involved were laden, it has not been urged that the wind was of any effect.

The steamtug Susan A. Moran is 142 feet over-all and has 1,200 horse-power engines; she was towing the Hygrade No. 12 on a 225 fathom hawser; the tank barge is of steel and her dimensions are 212 feet by 40 feet with 11½ foot sides. The hawser was on a 2-wire steel bridle and, as this tow proceeded in the course which has been stated and when the tug was in the vicinity of the Romer Shoal light, the Cumco was made out dead ahead at a distance of better than a mile, showing her port light and three white towing lights on her mast, on an expectable heading which would take her likewise through the Swash Channel.

The Cumco is 150 feet long and has 1,200 horse-power engines, and she had in tow three scows laden with rubbish to be dumped at sea; namely, the M-54, M-52 and M-50, in that order. They are each 150 feet long by 40 feet in beam and, as laden, had a freeboard of 2 feet at the bow.

As that tow rounded gong buoy No. 6, it was about 1,100 feet in length, which means that the towing hawser was about 500 feet long and the scows were close coupled.

As the Cumco straightened away in the channel, it was her intention to pay out hawsers to sea length, and this she proceeded to do, and the only question in the case is whether, during the accomplishment of that maneuver, the scows were

permitted to sag diagonally across the channel so that the second or third came in contact with the Hygrade No. 12.

The chart in evidence indicates that from the buoys on the westerly side of the channel to the range established by the Scotland Light-ship and the New Dorp Beacon is about 1,500 feet; that range does not touch the westerly edge of the Romer Shoal but admits of an easterly margin of about 200 feet; there is a wider space of waters between the edge of the Romer Shoal and Flynns Knoll to the westward, considerably in excess of what has been stated as the width of the channel as so computed.

Somewhere between gong buoy No. 6 and abreast of the Romer Shoal light, the Cumco signaled her scows that the hawsers were to be paid out to sea length, and this was accomplished in three stages: The towing hawser was increased from 500 to 1,000 feet; then the intermediate hawser between the second scow and the first was lengthened to 600 feet; finally the intermediate hawser between the third scow and the second was lengthened to 600 feet. Thus the tow, which had measured about 1,100 feet rounding gong buoy No. 6, was finally about 2,800 feet in length, and this operation required from fifteen minutes to half an hour for its accomplishment.

The Cumco hauled to her own starboard side of the channel promptly upon rounding gong buoy No. 6 and, after the operation of lengthening hawsers had been signaled, she exchanged a one-whistle signal with the Susan A. Moran to indicate a port passing; such is the testimony of her captain, and the Cumco brief is in error in asserting that the passing signal was not exchanged until after the lengthening operation had been completed.

It is obvious that, even though the Cumco's testimony be accepted that her engines were not stopped at any time during this maneuver, she could not have been exerting towing force while her own hawser was being paid out or while the sea hawsers were being successively paid out, for of course none of them could take a strain until taut or nearly so.

During that interval the scows tended to sag in the ebb tide toward Romer Shoal and, as this was observed on the Susan A. Moran, she stopped her engines and lost her way; that caused her own towing hawser to sag and then to drop to the bottom of the channel.

While the hawser in that position may not have acted strictly as an anchor, it did tend to arrest the progress of both the Susan A. Moran and the Hygrade No. 12.

Before the Cumco tow, which was by then strung out somewhat diagonally across the Swash Channel, was under way and bound to sea, her second scow came in contact with the Hygrade No. 12, causing the damage complained of in the libel.

Whether, in fact, the Susan A. Moran could have proceeded with her tow without danger of collision with any of the scows is a matter of conjecture. Her navigator thought that this was not possible or he would not have come to a stop. His judgment seems to have been verified by what actually took place, for as one of the scows in the Cumco tow did drift down upon the Hygrade No. 12 while the latter was not under way, it is reasonable to suppose that a collision could not have been avoided, had the Moran tow continued, even under the half speed which was initiated as she came abreast of Sandy Hook and which continued during all times here involved, until the Susan A. Moran came to a stop.

The fault of the Cumco depends upon the knowledge of her navigator of the presence of the inbound tow before he decided to lengthen his hawsers. His testimony as to the entire maneuver of lengthening hawsers is not as informing as it would have been, had he not been interrogated in leading form as to several important questions; for instance, he was asked:

"Q. After you got hooked up did you receive a signal from an inbound vessel? A. Yes."

While on cross-examination he said that he had been lengthening hawsers about ten minutes before exchanging the one-whistle signal and that he continued lengthening them for two or three minutes which might have been five or six or longer but he does not think so.

If this testimony is meant to develop that he did not observe the Moran tow until the exchange of the one-whistle signal, it is not convincing.

He should not have undertaken to lengthen his tow by a matter of 1,700 feet in a channel of the dimensions shown on the

chart in evidence, even though the waters west of Romer Shoal were more spacious than the 1,500 feet above stated, without first assuring himself that the operation could be accomplished without danger of contact with the inbound tow. And for failure either to promptly observe the Susan A. Moran and her tow or, having observed her, to conduct his maneuver, which has been described, so as to avoid danger of contact with that tow, it is thought that the Cumco must be held liable.

The findings are as follows:

(a) The tank barge Hygrade No. 12, in tow of the steamtug Susan A. Moran, was proceeding on the starboard side of the Swash Channel on March 8, 1938, properly, between the hours of 2:30 and 3 a. m., at half speed, namely, 3 miles an hour over the ground.

(b) At about 3 a. m. the Susan A. Moran stopped her engines in order to avoid probable contact with an outbound tow consisting of the tug Cumco and three loaded scows, then engaged in lengthening hawsers.

(c) The Susan A. Moran so came to a stop at about halfway between Romer Shoal light and gong buoy No. 6, near the westerly edge of Romer Shoal.

(d) This caused her hawser to fall to the bed of the channel, thus arresting the onward progress of the Hygrade No. 12.

(e) The latter was struck by the second scow in tow of the tug Cumco, while sea hawsers were being rigged on that tow.

(f) At the time when the Hygrade No. 12 was so struck, she was between the range established by the Scotland Lightship and the New Dorp Beacon, and the westerly edge of Romer Shoal.

(g) The Susan A. Moran was not shown to have been negligent in so maneuvering her tow.

(h) The Cumco was at fault for that collision, in that she conducted or supervised the maneuver of lengthening hawsers to sea length, at a time and place where that could not be accomplished without danger to the Moran tow.

### Conclusions.

A. The libel against the Susan A. Moran must be dismissed, without costs.

B. The impleading petition against the Cumco has been sustained by the evidence, and the libelant is entitled to recover its damages against the Cumco and her owner, and her operator, with costs.

Settle decree.